JUDGE GRIESA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARCO CAPITAL CORPORATION LTD,

                Plaintiff,

   -against-

DEUTSCHE BANK AG,

                Defendant.

No.

ECF Case

12 CIV 7292



## COMPLAINT

Plaintiff Arco Capital Corporation Ltd. ("Arco"), by its undersigned counsel, as and for its Complaint against defendant Deutsche Bank AG ("Deutsche Bank"), alleges as follows:

### Introduction

1.     This action arises out of Deutsche Bank's intentional or reckless misconduct in connection with a June 2006 collateralized loan obligation ("CLO") transaction (the "Transaction"), known as CRAFT EM CLO 2006-1 (the "Issuer").

2.     As described in more detail herein, Deutsche Bank created the Issuer and caused it to enter into a credit default swap agreement (the "CDS Agreement") with Deutsche Bank. The CDS Agreement applied to a portfolio (the "Reference Portfolio") of Deutsche Bank-originated lending transactions to companies in emerging markets (each, a "Reference Obligation"). The original maximum size of the Reference Portfolio was $500 million.

3.     A credit default swap is similar to an insurance policy. Under the terms of the CDS Agreement, Deutsche Bank made premium-like payments to the Issuer ("CDS Fee Payments"). In exchange, if a Reference Obligation defaulted in certain specified ways (a

"Credit Event"), the Issuer was required to pay Deutsche Bank sixty-five percent (65%) of the defaulted notional amount (a "Credit Event Payment").

4.     The Issuer raised the capital required to make Credit Event Payments to Deutsche Bank by issuing Notes to investors ("Noteholders").  The Notes were issued in tranches with different levels of seniority: Class E, Class F, and Class G, with Class G as the most junior.  The Notes are "securities" under the Securities and Exchange Act of 1934 (the "Exchange Act").

5.     Although the Noteholders were non-U.S. investors, the sale of the Notes occurred in the United States.  Deutsche Bank caused the Issuer to enter into an Indenture, dated June 21, 2006 (the "Indenture") with HSBC Bank USA, N.A. ("HSBC"), located in New York, as Trustee.  Pursuant to the Indenture, the Issuer granted to HSBC, *inter alia*, all its rights under the CDS Agreement.  All payments with respect to the Transaction were made to or by HSBC. The Notes expressly did not become valid and binding until the Noteholders delivered the purchase price to HSBC in New York.  In addition, the Transaction was created, structured, and managed, in whole or in substantial part, by Deutsche Bank employees in New York.

6.     HSBC used Deutsche Bank's CDS Fee Payments to make interest payments on the Notes.  It held the proceeds from the sale of the Notes to investors (the "Note Collateral"), and used such proceeds to make Credit Event Payments to Deutsche Bank, with the remainder to be used to repay the principal balance due on the Notes at the expiration of the Transaction.  When Deutsche Bank declared a Credit Event and HSBC made a Credit Event Payment from the Note Collateral, the principal balance due on the most junior Notes was correspondingly reduced.  If the principal balance due on the most junior Notes was reduced to zero, any additional Credit Events would begin to reduce the principal balance due on the second

2

most junior tranche of Notes.  Thus, each Credit Event Payment benefitted Deutsche Bank at the direct expense of the Noteholders.

7.     Deutsche Bank dominated and controlled the Transaction.  It unilaterally selected which of its emerging markets lending transactions would be Reference Obligations included in the Reference Portfolio at any given time.  Although the CDS Agreement contained requirements with which Deutsche Bank was supposed to comply, several such requirements were dependent on Deutsche Bank's discretion and good faith.  Deutsche Bank also controlled the information provided to the parties to the Transaction concerning whether it was complying with the terms of the CDS Agreement.

8.     The stated purpose of the Transaction was to reduce Deutsche Bank's regulatory capital requirements with respect to the Reference Portfolio.  Because the Reference Portfolio was subject to the CDS Agreement, which was secured by the Note Collateral, Deutsche Bank reduced the amount it had to set aside to meet its capital requirements.

9.     The Transaction was patently *not* intended to be used by Deutsche Bank as a repository for poorly-underwritten, toxic or distressed lending assets.  The CDS Agreement contains protections for the Noteholders that should have prevented Deutsche Bank from taking advantage of the Transaction in that way.

10.    In January 2007, Deutsche Bank doubled the original size of the Transaction from $500 million to $1 billion (the "Upsize") in the face of impending regulations requiring it to reduce the risk on its books.  Deutsche Bank took advantage of the Upsize to dump ineligible lending transactions into the Reference Portfolio, and used its control over the Transaction to disguise its misconduct and frustrate the protections that existed for Noteholders. Beginning with the Upsize, Deutsche Bank managed the Transaction in a way that operated as a

fraud on the Noteholders.  Between 2007 and the end of the Transaction on July 15, 2012,
Deutsche Bank wrongfully obtained more than $86 million in Credit Event Payments to which it
was not entitled.

11.     None of the Reference Obligations that Deutsche Bank included in the
Reference Portfolio prior to the Upsize suffered a Credit Event.  Seventeen of the Reference
Obligations designated by Deutsche Bank after the Upsize suffered Credit Events.  Prior to the
Upsize, Deutsche Bank had estimated that the potential loss rate in the Reference Portfolio
would be less than 1%.  The loss rate after the Upsize was 14.28% of the maximum Reference
Portfolio.

12.     Arco purchased Notes in the Upsize for approximately $56 million.  As a
result of Deutsche Bank's misconduct, Arco has incurred damages in excess of $37 million.

13.     Arco asserts claims against Deutsche Bank for violation of Section 10(b)
of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder ("Rule
10b-5"), and for breach of the CDS Agreement as third-party beneficiary.

**The Parties**

14.     Arco is an exempted limited company organized and existing under the
laws of the Cayman Islands and externally managed by a company with its principal place of
business in Guaynabo, Puerto Rico.

15.     Deutsche Bank is a financial institution organized and existing under the
laws of Germany.  Deutsche Bank's principal place of business in the United States is 60 Wall
Street, New York, NY 10005.

**Jurisdiction and Venue**

16.     This Court has subject matter jurisdiction pursuant to Section 27 of the

Exchange Act, 15 U.S.C. § 78aa, because Arco asserts a claim for violation of Section 10(b) of

the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5, and pursuant to 28 U.S.C. § 1367

(supplemental jurisdiction).

17.    This Court has personal jurisdiction over Deutsche Bank because it

consented to such jurisdiction in the documents governing the Transaction.  This Court also has

jurisdiction over Deutsche Bank because it is located in this District and controlled the

Transaction in whole or in significant part from its offices in this District.

18.    Venue is proper under 28 U.S.C. § 1391 because documents governing the

Transaction provide for venue in this District, because Deutsche Bank resides in this District, and

because a substantial part of the events giving rise to this action occurred in this District.

<u>**Allegations**</u>

<u>**Deutsche Bank's Emerging Markets Lending and Internal Credit Ratings**</u>

19.    Among its other lines of business, Deutsche Bank engages in lending to

companies in emerging markets.

20.    Deutsche Bank holds itself out as a prudent, diligent lender.  In an April

2006 investor presentation (the "Investor Presentation") for the Transaction, Deutsche Bank

described itself as "an experienced loan originator," with "disciplined loan origination" practices,

and described its underwriting standards as involving "in-depth credit research (both bottom-up

and top-down), due diligence, and a rigorous approach to servicing and workout procedures."

Investor Presentation, at 27, 32.  According to Deutsche Bank, its "EM [emerging markets] loan

losses have averaged 1.35% during 1999-2005," and the investments it selected for the original

Reference Portfolio in June 2006 had "better credit quality than DB's global EM portfolio."  It

estimated that the Reference Portfolio, as originally constituted, would have a default rate on the order of ".085%." *Id.*, at 32.

21.     The CDS Agreement required that Deutsche Bank's borrower or other counterparty to a Reference Obligation have a minimum credit rating.  If one of the rating agencies, such as Moody's or S&P, rated the counterparty, then that rating was used.  However, many companies in emerging markets are not rated by the rating agencies.  Where no other rating is available, the applicable rating is Deutsche Bank's own "internal" rating ("Internal DB Ratings") reflecting its assessment of the credit worthiness of its counterparties.

22.     The rating agencies periodically review Deutsche Bank's internal ratings process and provide "mapping tables" showing how Internal DB Ratings correlate to their ratings.  For example, in the Moody's mapping table for Deutsche Bank in June 2006 (which was included in the CDS Agreement), an Internal DB Rating of "iA" (the "i" reflects an "internal" rating) is listed as being equivalent to a Moody's rating of "A2."

23.     In the Investor Presentation, Deutsche Bank stated that "Moody's and Fitch recently completed an update of their mapping of the DB internal rating scale to their ratings." *Id.* at 37.  This process included a "review" by Moody's of "the DB rating process in emerging markets in general." *Id.*

### Deutsche Bank's Loan Exposure Management Group

24.     To the extent that Deutsche Bank's lending transactions remain on its balance sheet, they expose Deutsche Bank to credit risk (the risk that a borrower will default) and also increase the amount of capital Deutsche Bank must set aside to comply with applicable regulatory capital requirements.

25.     In 2003, Deutsche Bank created its Loan Exposure Management Group ("LEMG") to manage "the credit risk" within its commercial lending portfolio.  Deutsche Bank 2004 Annual Report, at 137.  One of LEMG's "primary initiatives" is to "manage credit exposures actively by utilizing techniques" such as CLOs, including the Transaction.  *Id.*

26.     LEMG was responsible for creating and running the Transaction.  The Investor Presentation stated that LEMG manages Deutsche Bank's "global lending portfolio" (*id.* at 27), and "bases decisions regarding inclusion of assets [in the Reference Portfolio] on external sources and internal ratings data."  *Id.* at 26.  When the Transaction closed in June 2006, Deutsche Bank issued a press release announcing "Deutsche Bank's Loan Exposure Management Group Issues Landmark Emerging Markets CLO."

27.     The LEMG employees responsible for the Transaction, including selecting Reference Obligations, are located in London and New York.  Sourav Sinha, an LEMG employee located in London, was substantially involved in marketing the Transaction, in conjunction with New York employees Mario Verna ("Verna"), David Burroughs ("Burroughs"), Peter Rose ("Rose"), and Sanjeev Punjabi ("Punjabi").  The individuals most directly responsible managing the Transaction were in New York, including without limitation Verna, Burroughs, Rose, Punjabi, Douglas Darman and others.

28.     Upon information and belief, Verna is a Managing Director with LEMG in New York, and was one of the senior Deutsche Bank employees responsible for the Transaction. He has been quoted in multiple news articles relating to the Transaction and LEMG.  For example, a July 1, 2006 article on Risk.net quotes Verna as saying that LEMG will "manage" the Transaction, and that it "will effectively shift much of Deutsche's emerging markets risk off the

7

books, allowing it to expand its lending activities." *See* http://www.risk.net/risk-
magazine/news/1497927/deutsche-launches-emerging-market-clo (last visited Sept. 12, 2012).

### The Issuer

29.     For the Transaction, Deutsche Bank created a special-purpose entity
("SPE"), the Issuer, in or around late May 2006.

30.     The Issuer is a Cayman Islands exempted limited liability company.  It has
no employees or officers.  Pursuant to an Administration Agreement, dated June 9, 2006, the
Issuer is administered by Maples Finance Limited, a Cayman Islands company that specializes in
providing corporate governance and administrative services for SPEs.

### The CDS Agreement

31.     The CDS Agreement is made up of three agreements between Deutsche
Bank and the Issuer: (a) an ISDA Master Agreement, dated as of June 21, 2006 (the "ISDA
Master Agreement"); (b) a Schedule, dated as of June 21, 2006 (the "Schedule"); and (c) a
Confirmation (the "Confirmation").  Each of these agreements incorporates the others by
reference.  These documents were subsequently amended during the Upsize.  Except where
otherwise noted, references to the ISDA Master Agreement, the Confirmation and the Schedule
include amendments.

32.     Pursuant to Paragraph 4(h) of the Schedule, the CDS Agreement "shall be
governed by, and construed and enforced in accordance with, the laws of the State of New York
(without reference to its choice of law doctrine)."

33.     Pursuant to Paragraph 13(b) of the ISDA Master Agreement, the Issuer
and Deutsche Bank each "irrevocably" submitted to the jurisdiction "of the court of the State of
New York and the United States District Court located in the Borough of Manhattan."

34.     The maximum size of the Reference Portfolio when the Transaction closed in June 2006 (prior to the January 2007 Upsize) was $500 million.  Confirmation, ¶ 1 (definition of "Initial Portfolio Notional Amount").

35.     The obligor with respect to a lending transaction that Deutsche Bank designated as a Reference Obligation is defined as a "Reference Entity." *Id.* (definition of "Reference Entity").

36.     The initial Reference Obligations in the Reference Portfolio were identified in Schedule A to the Confirmation.  Subject to certain requirements (the "Replenishment Conditions"), Deutsche Bank could change ("Replenish") the Reference Portfolio at any time by (a) removing Reference Obligations; (b) adding new Reference Obligations (subject to the maximum amount of $500 million); and/or (c) increasing or decreasing the notional amount of a particular Reference Obligation without removing it from the Reference Portfolio. *Id.* ¶ 5 & Schedule D.  The Replenishment Conditions are described *infra* at ¶¶ 57-60.

37.     Each Reference Obligation had to meet five eligibility criteria ("Eligibility Criteria"), both on the date it was first included in the Reference Portfolio, and on the date of any Replenishment that increased the notional amount of the Reference Obligation (each such date, a "Relevant Date").  Confirmation, ¶ 1 (definition of "Reference Obligation Eligibility Criteria) & Schedule C.  The Eligibility Criteria are described in detail *infra* at ¶¶ 44-56.

38.     The Confirmation defines two types of Credit Events relevant to this action: "Bankruptcy" Credit Events and "Failure to Pay" Credit Events. *Id.* ¶ 3.

39.     Under the ISDA Master Agreement, a Bankruptcy Credit Event is broadly defined to include not only a voluntary or involuntary bankruptcy filing (or similar proceeding),

but also includes, among other things, a Reference Entity becoming "insolvent" or "unable to pay its debts" as they become due.

40.    A Failure to Pay Credit Event means "the failure of the Reference Entity . . . to make, when and where due, any payments in respect of interest, fees . . . or principal or other amount under or in respect of" a Reference Obligation.  Confirmation ¶ 3.

41.    For each Credit Event, the Confirmation requires that Ernst & Young ("E&Y"), as "Independent Accountant," provide a certification (an "E&Y Certification"): "(a) that such Defaulted Reference Obligation satisfied the Reference Obligation Criteria [the Eligibility Criteria] and, if added to the Reference Portfolio pursuant to a Replenishment, did not . . . contravene the Replenishment Conditions, in each case on the Relevant Date, (b) verifying that the Credit Event identified in the Credit Event Notice had occurred and (c) verifying the computation of the relevant Loss Determination Amount." *Id.* ¶ 4.

42.    The E&Y Certification requirement was an express *"condition precedent"* to Deutsche Bank's entitlement to any Credit Event Payment.

43.    The E&Y Certification requirement was the only independent, external safeguard in the Transaction designed to ensure Deutsche Bank's compliance with the terms of the CDS Agreement.

### The Eligibility Criteria

44.    Each Reference Obligation had to meet *all* Eligibility Criteria, both when Deutsche Bank originally designated it as a Reference Obligation and on any subsequent Replenishment dates on which Deutsche Bank increased the dollar amount of such Reference Obligation.

A.    **Minimum Rating**

45.    The first Eligibility Criteria was that the Reference Entity related to the Reference Obligation have "an S&P Equivalent Rating of 'B-' or better and a Moody's Equivalent Rating of 'B3' or better." *Id.*

46.    If S&P and/or Moody's rated the Reference Entity, then the actual S&P and/or Moody's rating was to be used for the "Equivalent Ratings." *Id.*, Schedule E.

47.    If, however, S&P and/or Moody's did *not* rate the Reference Entity, then the "Equivalent Ratings" meant the S&P and/or Moody's ratings that correlated to the *Internal DB Rating*, according to the applicable "mapping" table provided by S&P or Moody's. *Id.*

48.    Thus, if the Reference Entity was not rated by S&P or Moody's, Deutsche Bank's compliance with the first Eligibility Criteria depended entirely on its good faith in assigning an Internal DB Rating.  The Internal DB Rating was required to be the "credit rating assigned by [Deutsche Bank] to such Reference Entity for purposes of [Deutsche Bank's] generally applicable internal credit evaluation and monitoring processes." *Id.*

49.    In addition, the definition of "Moody's Equivalent Rating" required that Deutsche Bank apply the *current* Moody's mapping table.  *Id.*  A Moody's mapping table was shown in a table listed in Schedule E to the Confirmation, but it was to be applied "as such table may be updated from time to time by Moody's." *Id.*

B.    **Origination in Accordance with Credit Policies**

50.    The second Eligibility Criteria is that the Reference Obligation "relates to a senior secured or unsecured obligation of the relevant Reference Entity that has been originated by [Deutsche Bank] in accordance with its standard credit policies and guidelines." Confirmation, Schedule C.

51.     Thus, *inter alia,* Deutsche Bank had to adhere to its standard credit policies and guidelines, and could not, for example, designate poorly-underwritten lending transactions as Reference Obligations.

**C.     Absence of Existing or Pending Credit Event**

52.     The third Eligibility Criteria was that "[a] Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event shall not have occurred in relation to such Reference Obligation." Confirmation, Schedule C. Thus, Deutsche Bank could not designate a lending transaction as a Reference Obligation if either (a) a Credit Event had already occurred, or (b) some event had occurred that would cause a Credit Event to occur with the "giving of notice" or "the lapse of time."

53.     As one example, if either an event constituting a Failure to Pay Credit Event or an event that would become a Failure to Pay Credit Event with notice or the passage of time had occurred prior to Deutsche Bank's designation of the Reference Obligation, then Deutsche Bank's designation of the Reference Obligation violated the third Eligibility Criteria.

54.     As another example, if a Reference Entity were insolvent (which constitutes a Bankruptcy Credit Event) prior to Deutsche Bank's designation of the corresponding Reference Obligation, or if some event had occurred that would cause the Reference Entity to become insolvent with "the lapse of time," Deutsche Bank's designation of the Reference Obligation violated the third Eligibility Criteria.

**D.     Legality and Enforceability**

55.     The fourth Eligibility Criteria was that the Reference Obligation "shall be legally valid and enforceable in accordance with its terms and applicable provisions of law." *Id.*

**E.**     **Nature of the Reference Obligation**

56.     The fifth Eligibility Criteria was that the Reference Obligation meet the

definition of Reference Obligation in the Confirmation.

**The Replenishment Conditions**

57.     In order for Deutsche Bank to make changes to (Replenish) the Reference

Portfolio, all of the Replenishment Conditions had to be satisfied.  Confirmation, Schedule D.

The Replenishment Conditions consisted of requirements as to the overall composition of the

Reference Portfolio, and limited Deutsche Bank's ability to make further changes if the condition

of the Reference Portfolio had deteriorated beyond a certain point.  *Id.*

58.     For purposes of this action, the most significant Replenishment Condition

is that the "Moody's Rating Condition Test is satisfied."  This is the most important

Replenishment Condition because it is the only one that Deutsche Bank could not avoid.  Even if

the other Replenishment Conditions were not satisfied, Deutsche Bank could still Replenish the

Reference Portfolio if in doing so it did not "cause the degree of compliance with any

Replenishment Condition to worsen."  *Id.*  However, this exception did *not* apply to the Moody's

Rating Condition Test: "no Replenishment shall be permitted if the Reference Portfolio does not

comply with clause (b) of the Replenishment Conditions."  Clause (b) is the Moody's Rating

Condition Test.  *Id.*

59.     The Moody's Rating Condition Test *incorporated the Moody's Equivalent*

*Ratings.*  If the Moody's Equivalent Ratings across the entire Reference Portfolio declined past a

certain point, the Moody's Rating Condition Test would fail.  If the Moody's Rating Condition

Test failed, Deutsche Bank could no longer add new Reference Obligations or otherwise

Replenish the Reference Portfolio.

60.     As described *supra* at ¶¶ 21-23, for a Reference Entity that was unrated by Moody's, the Moody's Equivalent Rating was the rating shown on the Moody's "mapping table" as being equivalent to the Internal DB Rating for that Reference Entity.  Thus, this Replenishment Condition, like the first Eligibility Criteria, depended on the good faith of Deutsche Bank in assigning Internal DB Ratings to the Reference Entities and in applying the Moody's "mapping table," which was required to be applied "as such table may be updated from time to time by Moody's."  Confirmation, Schedule E.

### The Note Subscription Agreement

61.     The Notes were sold pursuant to a Note Subscription Agreement between the Issuer and each purchaser.  The Note Subscription Agreement provides that it is governed by New York law.

62.     The Note Subscription Agreement provides that the "purchase price" shall be transmitted "to the account to be advised to the Purchaser by the Trustee [HSBC]."

63.     The Note Subscription Agreement does not itself contain the material terms governing the Noteholders' investment.  Instead, it refers to the Indenture as well as other "Transaction Documents," including the CDS Agreement.  The Note Subscription Agreement required each purchaser to represent and warrant that it had "received the Indenture and the other Transaction Documents setting forth the terms and provisions of the Notes and the Transaction Documents and has not relied on any information relating to the Company [the Issuer], the Issuer Swap Counterparty [Deutsche Bank], . . . or any other person *other than* the information that is contained in, and the terms and provisions of, the Indenture and the other Transaction Documents."  Note Subscription Agreement, ¶ 4(e) (emphasis added).

64.     Thus, Arco and the other Noteholders were expressly invited and intended to rely on the terms of the CDS Agreement and other Transaction Documents in purchasing Notes.  The CDS Agreement contains the essential terms of the Noteholders' investment, including the Eligibility Criteria and the Replenishment Conditions.  These provisions were intended for the Noteholders' benefit and protection, and to induce the Noteholders to purchase Notes.

65.     The Note Subscription Agreement provided that the Notes would become "valid and binding obligations" of the Issuer when they had been "paid for by the Purchaser pursuant to Section 2 hereof," which required the purchaser to deliver funds "to the account to be advised to the Purchaser by the Trustee [HSBC]."  *Id.*, ¶¶ 2(a) and (i).  The Notes also had to be "authenticated" by HSBC to become valid and binding.  *Id.*, ¶ 2(i).

### The Indenture

66.     Pursuant to the Indenture, the Issuer broadly conveyed "all of its estate, right, title and interest (but not the obligations), whether now owned or hereafter acquired or arising, in, to and under all of the following property," which included, among other things, all the Issuer's "rights" under the CDS Agreement.  Indenture, at 1.

67.     The Indenture required HSBC to open and maintain two accounts, the "Collection Account" and the "Custodial Account."  *Id.* § 10.2.

68.     Deutsche Bank sent its CDS Fee Payments under the CDS Agreement to HSBC, for deposit into the Collection Account.  HSBC used the Collection Account to pay administrative expenses of the Transaction (including of HSBC and the Issuer), and to pay Noteholders the interest due on their Notes.  *Id.* § 11.1(b)(i).