69. HSBC held the Note Collateral in the Custodial Account. HSBC used funds in the Custodial Account to make Credit Event Payments to Deutsche Bank. The rest of the time, HSBC invested the funds on deposit in the Custodial Account in "Eligible Investments," which were required to be held at Deutsche Bank in London and which were, upon information and belief, highly-liquid interest-bearing securities. The interest on the Note Collateral could be added to the Collection Account and used to pay administrative expenses if needed, but otherwise was added to the Note Collateral in the Custodial Account. *Id.* § 11.1.

70. Deutsche Bank controlled all the information on which HSBC made Credit Event Payments from the Custodial Account. Deutsche Bank provided HSBC with "Information Reports," which included any amounts to be paid to Deutsche Bank as a result of any Credit Events, as well as the current list of Reference Obligations in the Reference Portfolio (known as a "Reference Registry"). *Id.* § 10.5. Under the Indenture, HSBC was entitled to rely on the Information Reports. *Id.* § 6.1.

71. At the end of the Transaction, HSBC used "the remaining amount on deposit in the Custodial Account" (*id.* § 11.1(c)(ii)) to pay Noteholders the outstanding principal balances due on their Notes (the original principal balance less reductions for Credit Events claimed by Deutsche Bank).

72. Attached hereto as Exhibit A is a chart showing the structure of the Transaction (taken from Deutsche Bank's Investor Presentation).

### The January 2007 Upsize and Deutsche Bank's Scheme

73. In its June 2006 Investor Presentation, Deutsche Bank had claimed among other things that its interests were "aligned with" the investors in the Transaction, that LEMG "works closely with the loan origination and relationship function" in Deutsche Bank's Global

16

Banking Division, "to develop high value adding global customer relationships," and that the Reference Portfolio "has better credit quality than DB's global EM [emerging markets] portfolio." Deutsche Bank had also touted its "superior credit management" and "disciplined loan origination," and estimated that the default rate in the Transaction would be "0.85%." Investor Presentation, at 32.

74. None of the Reference Obligations designated by Deutsche Bank prior to the Upsize became Credit Events.

75. Upon information and belief, in late 2006, Deutsche Bank directed LEMG to decrease the amount of risk on Deutsche Bank's books as a result of regulatory changes soon to be applicable, known as "Basel II." Deutsche Bank decided to double the amount of the Reference Portfolio from $500 to $1 billion, so that it could reduce the amount of its regulatory capital.

76. Upon information and belief, at the time of the Upsize individuals with LEMG knew that some of the emerging markets lending transactions on Deutsche Bank's books were poorly underwritten and/or otherwise highly risky, particularly certain of Deutsche Bank's lending transactions that had been structured as swaps and other derivative products. Upon information and belief, such individuals realized that the Upsize provided an opportunity for LEMG to impose the risk of some of these poor quality lending transactions on the Noteholders. Moreover, they knew that because of Deutsche Bank's level of discretion and control over the Transaction and information relating to its compliance with the terms thereof, it would be difficult for the Noteholders to obtain information about the Reference Obligations. Such individuals, upon information and belief, determined to use the Upsize to designate some of Deutsche Bank's poor investments – knowing that they did not meet the requirements of the

17

Transaction – as Reference Obligations and cause the Noteholders to incur 65% of any losses therefrom.

77. In January 2007, Deutsche Bank effected the Upsize, doubling the Reference Portfolio, and caused the Issuer to double the amount of Notes sold to investors. In place of the original Class E, F and G Notes, the Issuer sold new Class E-1, E-2, F-1, F-2, G-1 and G-2 Notes to the Noteholders, including Arco. In addition, Deutsche Bank changed the definition of "Reference Obligations" in the CDS Swap Agreement to include not only loans and similar investments, but also (a) a broad range of derivatives, including "any rate swap transaction," "currency swap transaction," "credit derivative transaction or any other similar or other derivative transaction." First Amended and Restated Confirmation, dated January 26, 2007. It also added to the definition of Reference Obligation "a senior unsecured or unsecured note of the Reference Entity issued pursuant to an indenture or equivalent instrument." *Id.*

78. The documents governing the Transaction, including the Indenture and the Confirmations, were amended and update to reflect the Upsize and the issuance of the new Notes, but otherwise remained materially the same, including the Eligibility Criteria, the Replenishment Conditions, the E&Y Certification requirement, and the requirement that Deutsche Bank use up-to-date Moody's mapping tables in correlating its Internal DB Ratings.

79. Immediately after the Upsize closed in January 2007, Deutsche Bank designated several of the Reference Obligations that would ultimately suffer Credit Events. Two of the Reference Obligations added in January 2007 involved Reference Entities that were, as Deutsche Bank knew or was reckless in not knowing, engaged in blatant accounting fraud.

80. Ultimately, seventeen of the Reference Obligations that Deutsche Bank designated after the Upsize suffered Credit Events. The defaulted Reference Obligations had an aggregate notional balance of $142,782,023, a loss rate of 14.28%.

### Arco's Purchases and Sales of Notes

81. In June 2006, a company associated with Arco, Gramercy Emerging Markets Fund ("Gramercy") purchased Class F and Class G Notes on its behalf. Gramercy purchased the Notes by sending the purchase price to HSBC in New York.

82. At the time, Arco was not yet operational. Deutsche Bank knew and agreed that Gramercy was not purchasing the Notes on its own behalf, but rather was purchasing the Notes to hold (or "warehouse") on behalf of Arco.

83. In January 2007, Gramercy purchased new Notes in the Upsize on behalf of Arco. The funds it had paid to HSBC for the Class F and Class G Notes was applied to purchase the new Class F-1 and Class G-1 Notes (governed by the newly amended terms of the CDS Swap Agreement), and also sent additional funds to HSBC to purchase Class F-2 and Class G-2 Notes. Gramercy, as agent for Arco, purchased Class G-1 Notes with an original notional amount of $15 million, Class G-2 Notes with an original notional amount of $15 million, Class F-1 Notes with an original notional amount of $8.75 million, and Class F-2 Notes with an original notional amount of $17.5 million.

84. In May 2007, Gramercy transferred the Notes to Arco in a pass-through transaction, in which Arco reimbursed Gramercy at par for the amounts Gramercy had advanced to purchase the Notes for Arco.

85. In July 2008, after Deutsche Bank had declared the first three Credit Events, Arco sold its Class G-1 and Class G-2 Notes in a Deutsche Bank-sponsored

19

"repackaging" transaction. However, Arco retained a beneficial interest in the Class G-1 and Class G-2 Notes and continued to incur damages with respect thereto as Deutsche Bank continued to declare Credit Events and obtain Credit Event Payments.

86. As a result of the Credit Events, the principal balances on the Class G-1 and Class G-2 Notes were reduced by 100% (to zero), and the principal balance on Arco's Class F-1 and Class F-2 Notes was reduced by approximately 94%.

87. In all, Arco lost more than $37 million as a result of the Credit Events.

### Deutsche Bank's Misconduct

88. After the Upsize, Deutsche Bank systematically violated the terms of the Transaction and engaged in other misconduct so pervasive that it demonstrates an intention to use the Transaction to commit fraud on the Noteholders, including Arco.

A. **Frustration of the E&Y Certification Condition Precedent**

89. It was an express condition precedent to Deutsche Bank's entitlement to Credit Default Payments that E&Y, as "*Independent Accountant*," provide a "*certification*" that the defaulted Reference Obligation "satisfied the Reference Obligation Criteria [the Eligibility Criteria] and, if added to the Reference Portfolio pursuant to a Replenishment, did not . . . contravene the Replenishment Conditions." Confirmation ¶ 4. The E&Y Certification requirement existed to protect the Noteholders.

90. Arco has obtained purported E&Y Certifications for five Credit Events. E&Y Certifications are not provided to the Noteholders under the terms of the Transaction documents, and Arco has not been able to obtain any others.

91. All of the E&Y Certifications obtained by Arco utterly fail to satisfy the requirement that E&Y certify Deutsche Bank's compliance with the Eligibility Criteria and the

20

Replenishment Conditions. In two, E&Y expressly states that it was "not provided with the necessary information" to certify compliance with "Eligibility Criteria 2, 3, 4 and 5." *See* Exhibit B.

92. In the other E&Y Certifications obtained by Arco, E&Y *merely assumed* that Deutsche Bank had complied with the Eligibility Requirements and the Replenishment Conditions, based on Deutsche Bank's representations. These E&Y Certifications include a list of "Assumptions." The Assumptions track the precise language of Eligibility Criteria 2, 3, 4 and 5. When this "assumptions" formulation is used, E&Y states that it "performed no procedures to verify the accuracy of the Assumptions *provided to us by the Issuer Swap Counterparty*," i.e. Deutsche Bank (emphasis added). *See* Exhibit C.

93. Upon information and belief, the Deutsche Bank employee(s) who provided the "Assumptions" to E&Y were one or more LEMG employees in New York, and they knew, or were reckless in not knowing, that the Assumptions were false.

94. All of the E&Y Certifications obtained by Arco fail to satisfy the condition precedent that E&Y, as "Independent Accountant," certify that the defaulted Reference Obligation complied with the Eligibility Criteria and Replenishment Conditions. If unsubstantiated assertions of compliance by Deutsche Bank were all that was required, it would render the E&Y Certification requirement – the core protection for Noteholders (along with the Eligibility Criteria and Replenishment Conditions themselves) – a nullity.

95. Upon information and belief, the E&Y Certifications for *all* of the Credit Events, including those that Arco has not been able to obtain, have the same patent deficiencies and fail to satisfy the condition precedent.

96. Because none of the E&Y Certifications satisfy the condition precedent, Deutsche Bank was not entitled to any of the Credit Event Payments that it obtained. Deutsche Bank nonetheless caused HSBC to make the Credit Event Payments by providing HSBC with Information Reports (prepared by Deutsche Bank) that listed Credit Event Payments as being due to Deutsche Bank. Upon information and belief, the Deutsche Bank employees who provided such reports to HSBC knew, or were reckless in not knowing, that they were false.

B. **Manipulation of Moody's Equivalent Ratings**

97. The majority (between approximately 75%-80%) of the Reference Obligations designated by Deutsche Bank for inclusion in the Reference Portfolio were not rated by Moody's. For such Reference Entities, the Moody's Equivalent Rating was the rating that correlated to the Internal DB Rating according to the Moody's mapping table. The Confirmation required that Deutsche Bank apply the Moody's map "as such table may be updated from time to time by Moody's." Confirmation, Schedule E.

98. On April 6, 2009, Moody's issued a press release stating that it was downgrading some of the Notes. Moody's explained the reasons for the downgrade in the press release. One factor was that "for the majority of the underlying referenced assets, the equivalent Moody's ratings used in our analysis are obtained through a mapping process between the originator's [Deutsche Bank's] internal rating scale and Moody's public rating scale." To "compensate" for this, Moody's applied a "half notch stress to the mapping scale." In addition, "*[b]ecause this mapping was performed prior to 1st April 2007*, an additional stress was applied *to capture potential deviations from the established mapping.*" Moody's press release dated April 6, 2009 (emphasis added).

99. Upon information and belief, based on this press release, Moody's updated its mapping table for Deutsche Bank in or around April 2007. In addition, because the Moody's press release refers to applying an "additional stress" due to Deutsche Bank's failure to use the "established mapping," the updated Moody's mapping table lowered the Moody's ratings that correlated to Internal DB Ratings.

100. The Reference Registries show that Deutsche Bank did not apply an updated Moody's mapping table in or after April 2007.

101. The Moody's Rating Condition Test failed in or around October 2008. Thereafter, Deutsche Bank could no longer Replenish the Reference Portfolio.

102. Upon information and belief, the Moody's Rating Condition Test would have failed earlier had Deutsche Bank applied the April 2007 updated Moody's mapping table. The high percentage of Reference Obligations (75%-80%) that were not rated by Moody's and were therefore given Moody's Equivalent Ratings based on the mapping table meant that any shift downwards in the correlation between Internal DB Ratings and Moody's Equivalent Ratings would have had a significant impact on the Moody's Rating Condition Test.

103. Had the Moody's Rating Condition Test failed in April 2007 (when Moody's updated the mapping table), Deutsche Bank would have been unable to add 11 of the 17 defaulted Credit Events to the Reference Portfolio. The 11 defaulted Reference Obligations added by Deutsche Bank after Moody's updated the mapping table had an aggregate notional balance of more than $100 million, which represents 70% of the total losses.

104. Upon information and belief, the LEMG employees managing the Transaction knew, or were reckless in not knowing, that Moody's had updated the mapping table in or around April 2007, and intentionally or recklessly continued to use the old Moody's

mapping table in order to be able to falsely report higher Moody's Equivalent Ratings for the Reference Obligations in the Reference Portfolio. Upon information and belief, such employees did this in order to preserve their ability to Replenish the Reference Portfolio, and thereby add Reference Obligations that were likely to default, as long as possible.

105.  In addition, upon information and belief, one or more of the defaulted Reference Obligations would not have met the first Eligibility Criteria (requiring a minimum Moody's Equivalent Rating) had Deutsche Bank applied the Moody's mapping table as updated by Moody's.

### C.  Specific Credit Events

106.  Arco has limited information about the Reference Obligations and the Credit Events, because such information is generally non-public and is within Deutsche Bank's control. Therefore, the examples described herein are not exhaustive. However, several of the Credit Events involve Reference Entities that have been publicly revealed as engaging in widespread fraudulent accounting practicing or other wrongdoing, or have publicly challenged Deutsche Bank's lending practices. The information that is publicly available is highly suggestive of intentional fraud or recklessness by Deutsche Bank.

### Egana International (Holdings) Limited

107.  One of the first Credit Events declared by Deutsche Bank was with respect to a Reference Obligation involving Egana International (Holdings) Limited ("Egana"), in the amount of $7.8 million. Deutsche Bank designated it as a Reference Obligation right after the Upsize in late January 2007. Less than nine months later, Egana collapsed when its fraudulent accounting practices were publicly revealed, and Deutsche Bank declared a Credit Event in September 2007.

108. Egana, a Hong Kong company, was not rated by either Moody's or S&P, so the Internal DB Rating was the rating used to determine the Moody's Equivalent Rating. Deutsche Bank gave Egana an Internal DB Rating of iBB when it added the Reference Obligation to the Reference Portfolio in January 2007. This could not have been a good faith rating. To the contrary, that Deutsche Bank would rate it at all demonstrates intentional fraud or recklessness. Any reasonable due diligence, and certainly the "in-depth credit research (both bottom-up and top-down)" touted by Deutsche Bank in the Investor Presentation, would have put Deutsche Bank on notice that Egana was engaging in wholly fictitious accounting.

109. Shortly before the end of Egana's 2004 fiscal year, it changed auditors, from one of the "big four" accounting firms to a smaller firm. The second auditor completed the financials for the 2004 fiscal year, but then Egana changed auditors *again* shortly before the end of its 2005 fiscal year. Both times, Egana claimed in public notices that it was changing auditors purely for "cost competitiveness" reasons.

110. The largest "asset" identified on Egana's financial statements was an entry for unexplained, unsecured "promissory notes," which the company listed as "cash equivalents." Although the "promissory notes" were listed as short-term, Egana's financials also indicated that they were being continuously rolled over.

111. When Egana collapsed and filed for liquidation in 2007, a new auditor was appointed and quickly determined that the "promissory notes" were fraudulent. Egana's liquidation petition describes just how obvious the fraud was: all the "promissory notes," though purportedly issued by different debtors at different times, bore the same interest rate of 7% and were "identical in terms of layout, style and font size. Similar spelling mistakes appeared in the purchase orders, delivery notes, etc. of the Debtors. These documents were also of the same

format, suggesting that the documents of the supposedly unrelated debtors might have come from a single source instead." In addition, "there were not any board minutes or documents detailing the commercial reasons and rationale behind the transactions," nor was there "any record . . . evidencing actual physical delivery of goods concerned."

112. Any reasonable due diligence would have included a review of the largest asset the company claimed to hold, particularly where the largest asset was "promissory notes."

113. Upon information and belief, in January 2007 Deutsche Bank, including LEMG employees in New York, knew or suspected the problems at Egana, and designated the Reference Obligation knowing that it would become a Credit Event. To do so, upon information and belief, one or more such individuals intentionally or recklessly gave Egana an inflated Internal DB Rating.

114. The E&Y Certification for the Egana Credit Default, one of the few E&Y Certifications Arco has been able to obtain, further demonstrates Deutsche Bank's intentional misconduct. E&Y did not certify anything. Instead, it listed "Assumptions" including, *inter alia*: (a) that Deutsche Bank's lending transaction with Egana met the definition of "Reference Obligation" and was in the amount of $7.8 million; (b) that the Reference Obligation "relates to a senior or unsecured obligation of the relevant Reference Entity that has been originated by [Deutsche Bank] in accordance with its standard credit policies and guidelines and represents an obligation where the primary risk is the credit risk of a corporate entity or a Sovereign;" (c) that the Reference Obligation was legally valid and enforceable; and (d) that a "Credit Event or other event which, with the giving of notice or the lapse of time (or both) would become a Credit Event" had not previously occurred.

115. These "Assumptions" *precisely track* Eligibility Criteria 2, 3, 4 and 5. Thus, E&Y merely "assumed" what it was supposed to certify. Moreover, the E&Y Certification makes clear that this was what Deutsche Bank told E&Y to do. The E&Y Certification recites that E&Y had performed such procedures as "were agreed to by" Deutsche Bank and the Issuer. Upon information and belief, the Issuer was not in fact involved, and the only people who communicated with E&Y were LEMG employees. E&Y also makes clear that the "Assumptions" came from Deutsche Bank ("We performed no procedures to verify the accuracy of the Assumptions provided to us by the Issuer Swap Counterparty," *i.e.* Deutsche Bank). The only Eligibility Criteria that E&Y did not merely "assume" was that Deutsche Bank had given Egana an Internal DB Rating of iBB, a matter wholly within Deutsche Bank's control.

116. The Egana E&Y Certification fails to satisfy the condition precedent in the Confirmation, which requires that E&Y, as "Independent Accountant," deliver an "irrevocable notice . . . containing a certification" of, among other things, compliance with the Eligibility Criteria and the Replenishment Conditions.

117. Upon information and belief, on or around September 2007, one or more LEMG employees, knowing that the E&Y Certification condition precedent had not been satisfied and that Deutsche Bank was not entitled to a Credit Event Payment, delivered an Information Report to HSBC showing a Credit Event Payment of $5,070,000 due to Deutsche Bank for the Egana Credit Event. HSBC paid this amount to Deutsche Bank for the Egana Credit Event.

118. The outstanding principal balances of the Class G-1 and Class G-2 Notes were each reduced by $2,535,000 as a result of the Egana Credit Event.